UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

B.D. and K.D., individually and on behalf of
R.D.,

                Plaintiffs,

         -against-

ELDRED CENTRAL SCHOOL DISTRICT,

                Defendant.

**<u>OPINION & ORDER</u>**

22-CV-03637 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

    Plaintiffs B.D. and K.D. (collectively, "Plaintiffs") bring this action, individually and on behalf of their minor son, R.D., against Eldred Central School District ("Defendant" or the "District"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*.[1] (Doc. 1, "Compl."). Plaintiffs seek judicial review of a decision by a State Review Officer ("SRO") at the New York State Education Department which found that: (i) the Impartial Hearing Officer ("IHO")'s decision that Defendant provided R.D. with a free appropriate public education ("FAPE") for the 2018-19 school year was final and binding on the parties; (ii) the District's disability classification of R.D. as "Other Health Impaired" did not deny him a FAPE for the 2019-20 and 2020-21 school years; (iii) Defendant took adequate steps to address bullying of R.D. from September 6, 2019 forward and, thus, R.D. was not denied a FAPE for that time period; and (iv) Plaintiffs were not entitled to reimbursement for a private neuropsychological evaluation of R.D. (*See generally* Doc. 1-2, "SRO"). Plaintiffs seek reversal of that decision, reimbursement for the

---

[1] The preliminary statement of the Complaint also states that the action is brought under Article 89 of New York Education Law § 4404(3), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*. Plaintiffs, however, did not substantively set forth in the Complaint any claims for relief under those statutes. (*See generally*, Compl.). Nevertheless, and as explained in more detail herein, those claims fail for the same reasons as Plaintiffs' IDEA claim.

costs of placing R.D. in private school for the 2019-20 and 2020-21 school years, pendency placement for the 2021-22 school year, compensatory education for the 2019-20 and 2020-21 school years, reimbursement for the private neuropsychological evaluations of R.D., attorneys' fees and costs, and declaratory relief. (Compl. at 18). Before the Court is Plaintiffs' motion for summary judgment, filed on February 6, 2023. (Doc. 22; Doc. 33, "Pl. Br."; Doc. 25, "Opp. Br."; Doc. 29, "Reply": Doc. 27, "56.1").

For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED, the SRO's decision is AFFIRMED, and this action is dismissed.

## BACKGROUND

The Court has reviewed the administrative record provided by the parties.[2] The following facts are drawn from the parties' Local Rule 56.1 Statement, (Doc. 27, "56.1"), transcripts of the testimony heard by the IHO, exhibits introduced at the IHO hearing, and the decisions of the IHO and SRO.[3] The Court adopts the SRO's thorough recitations of the factual background of the case except to the extent challenged by either party. The Court will address any such challenges herein as noted and otherwise will repeat the facts only to the extent necessary to adjudicate the extant motion.

---

[2] The record here was filed under seal, as is common in IDEA cases. As such, and in an abundance of caution, the Court will quote herein only to information that is substantively disclosed in the parties' briefing and thus, already made public. Moreover, both the IHO and SRO decisions quote from the same administrative record and were publicly filed with the Complaint. (Doc. 1-2; Doc. 1-3). The need for the Court to conduct a *de novo* review and cite directly to the record outweighs the potential privacy interest in refraining from doing so, especially in light of Plaintiffs' and R.D.'s pseudonymity in this matter. *See e.g. and generally*, *W.G. v. New York City Dep't of Educ.*, 801 F. Supp. 2d 142 (S.D.N.Y. 2011).

[3] The parties' submissions on these motions—including the joint Rule 56.1 Statement—and the SRO's decision each cite to exhibits in the administrative record as they are numbered therein, *i.e.* OSR, followed by a four-digit number signifying pagination within the administrative record. For ease of reference and the sake of consistency, the Court does the same in lieu of citing to the pagination generated by ECF.

I.      Factual Background

Beginning in October of 2013 and continuing until after R.D. was placed in private school, the District's Committee on Special Education ("CSE") convened on numerous occasions to craft individual education plans ("IEPs") for R.D., pursuant to IDEA and New York state law.[4] During the 2018-19 school year, concerns about bullying R.D. came to a head, leading to his removal from school for the 2018-19 year, revisions to the school's planning for 2019-20, and R.D.'s eventual private placement.

a.      R.D.'s Background

R.D. was born on September 19, 2006 and was enrolled in the District's schools from the time he began his education until he was placed in a private school on November 4, 2019. (56.1 at 1-2). R.D. is diagnosed with Autism Spectrum Disorder ("Autism"), Attention Deficit Hyper-Activity Disorder, reading and writing impairments, and chronic kidney disease. (Id. at 1-2).

b.      October 2013 to May 2018 IEPs

The CSE first held an IEP meeting for R.D. on October 31, 2013. (IHO at 3). He was classified as "Other Health Impaired" at that time and recommended for various special education services including counseling and speech and language therapy. (Id.). The CSE met approximately annually thereafter and implemented new IEPs for R.D. on June 6, 2014, April 9, 2015, April 28, 2016, and June 6, 2017. (Id.). During that time, R.D. was progressing through school, albeit with parental concerns about his reading and language skills resulting in independent evaluations being taken. (Id.). On December 7, 2017, the CSE met on the parents' request to review a private neuropsychological evaluation by the Child Mind Institute, which was taken to address R.D.'s social awareness skills. (Id. at 3-4). Around that same time, on December 21, 2017, Plaintiffs filed

---

[4] New York assigns responsibility for fulfilling the state's obligations under IDEA to local CSEs. N.Y. Educ. Law § 4402(1)(b)(1)(a); *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 833 (2d Cir. 2014).

a Dignity for All Students Act ("DASA") complaint to the District under New York State Law.[5]
(*Id.* at 4). The complaint was investigated and deemed unfounded. (*Id.* at 5). Plaintiffs voiced
concerns with R.S.'s progress at the May 30, 2018 CSE meeting and various evaluations and
testing accommodations were ordered. (*Id.* at 5-6). The May 30, 2018 IEP first acknowledged
Plaintiffs' concerns with bullying. (56.1 at 3).

        c.   The 2018-19 School Year

Concerns with bullying of R.D. came to a head during the 2018-19 school year, his seventh-
grade year. Plaintiffs requested a CSE meeting, which occurred on September 26, 2018. (IHO at
6). The CSE reviewed R.D.'s progress and updated goals for him in various categories including
social emotional, reading, writing, and speech. (*Id.* at 7). Shortly thereafter, Plaintiffs filed a
bullying report with the District about name-calling, assaults, and peer pressure by another student
to R.D.  (*Id.*). Plaintiffs had filed a bullying report in October of 2018 and R.D.'s IEPs continued
to acknowledge problems identifying social cues and making friends. The bullying report indicated
that R.D. was called vulgar names and physically assaulted by another student. (IHO at 7). Early
in 2019, R.D. began to have attendance issues at school. (*Id.* at 8).

The next IEP meeting occurred on January 17, 2019 and was also requested by Plaintiffs
as a program review. (*Id.* at 8). The CSE reviewed various evaluations taken of R.D. but ultimately
determined that accommodations were to remain constant, and the IEP classification did not need
to change. (*Id.*). The IEP continued to indicate Plaintiffs' concerns with bullying and noted R.D.'s
inability to identify social cues or make friends. (*Id.*). The March 15, 2019 IEP meeting included
R.D. and focused substantively on social and emotional goals in light of ongoing concerns about

---

[5] The purpose of DASA is "to afford all students in public schools an environment free of discrimination
and harassment." *S.C. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-01672, 2012 WL 2940020, at *6
n.9 (S.D.N.Y. July 18, 2012) (quoting N.Y. Educ. Law §§ 10-18).

R.D. in the school environment. (*Id.* at 9). The CSE introduced a plan to simplify and disseminate the IEP to staff but Plaintiffs objected because it did not address why R.D. was having a "meltdown" at that time. (*Id.*). On May 6, 2019, Plaintiffs filed a second DASA complaint, alleging that another student was repeatedly harassing R.D. and calling him vulgar names. (*Id.* at 9).

On May 9, 2019, R.D. was in an altercation with another student, which was captured on video. (Ex. 127).[6] The video shows R.D. and others walking down the hallway when another student approaches R.D. and pushes him to the ground as R.D. attempted to continue walking. (*Id.*). The SRO found that:

> There appears to be some confusion whether there were one or two incidents involving the student on May 9, 2019. The incident depicted in [Ex. 127] occurred on May 9th at 11:19 a.m. . . Later that same day at 12:06 p.m., the student hit another student and upon questioning did admit to striking the other student, for which he received the five day out of school suspension.

(SRO at 4, n.3).[7] The school called Plaintiffs about the events of May 9, 2019 and issued R.D. a five-day suspension. (IHO at 9-10). The District also offered to place R.D. at Sullivan West, a different public school district in the State. (*Id.* at 10). Plaintiffs, however, declined the placement and removed R.D. from school for the remainder of the 2018-19 school year because they felt the school was not safe. (*Id.*). A DASA complaint was filed for the incident reflected on Exhibit 127 and the resulting investigation confirmed that a bullying incident had occurred. (*Id.*).

---

[6] The Court will refer to this video as Exhibit 127 because it was not included as part of the administrative record that was stamped "OSR" and provided to the Court. The Court, however, understands that this exhibit was not included in the record given to the Court only because of a clerical error. (Doc. 19). Nevertheless, it was provided to Chambers by Plaintiffs and is referenced by the IHO and SRO as "Exhibit 127."

[7] Plaintiffs submitted under seal "Exhibit X," which is a set of screenshots of a Facebook post dated May 10, 2019. (Doc. 28). That exhibit was not admitted by the IHO or considered by the SRO, the propriety of which the Court will discuss *infra*. Nevertheless, that document appears to show the mother of the other student who was suspended for the events of that day, complaining about how the District handled the situation. Other parents, including some with positions at the school, liked and commented on the post.

d.      The June 24, 2019 IEP Meeting

The CSE met on June 24, 2019 to develop an IEP for the 2019-20 school year. (SRO at 4).

Plaintiffs expressed DASA concerns at that meeting and requested that R.D.'s disability

classification be changed to "Autism." (*Id.*). Notes from the meeting indicate, however, that the

primary focus of the meeting was R.D.'s academic progress and goals. (OSR 3754-60). The IEP

recommended continuing various educational services, small-group and individual counseling,

speech-language therapy, supplementary aides, and accommodations including specific seating for

transportation. (IHO at 4-5). The IEP removed language included in previous IEPs that Plaintiffs

had specifically expressed bullying concerns, (56.1 at 3), but noted that:

> [R.D.]'s parents have expressed concern that [R.D.] can be easily
> influenced by peer behavior, and often follows behaviors of other
> peers and then doesn't know when to stop . . . [R.D.] has a small
> group of friends that he enjoys spending time with in school. [R.D.]
> will continue to participate in both his group and individual
> counseling sessions to work on peer relationships.

(OSR 3769).

e.      The September 6, 2019 Safety Plan

The 2019-20 school year, R.D.'s eighth-grade year, began on September 2, 2019. (SRO at

22). The District prepared a "safety plan," dated September 6, 2019, to address bullying of R.D.

(OSR 4045). There is a dispute as to whether there was a meeting on that date and the extent to

which Plaintiffs were able to participate. (56.1 at 8).[8] The safety plan states that "[t]he purpose of

this plan is to provide a safe and secure learning environment that is free from harassment,

intimidation, or bullying of [R.D.]." (OSR 4045). The plan placed eleven obligations on District

staff including, *inter alia*: allowing R.D. the opportunity to leave class, call family, or contact other

---

[8] It is clear, as discussed *infra*, that there was a meeting between District staff and Plaintiffs on the safety
plan around this time and that Plaintiffs were able to voice their concerns during that meeting. That meeting,
however, was not a formal IEP meeting.

school staff members; letting R.D. out of class early and sending him to eat lunch separately to avoid contact with other students; mandatory monitoring and reporting of potentially problematic situations involving R.D. in school common areas, separation of R.D. and offending students during class and extra-curricular activities, and informing the school body at large about bullying policies and related issues. (*Id.* at 4045-46). The plan, additionally, placed three obligations on R.D. and two on Plaintiffs to help mitigate bullying issues. *Id.*

### f.   Subsequent Events

R.D. did not return to District schools at all for the 2019-20 school year. (IHO at 12). Plaintiffs notified the District on October 17, 2019 that they intended to privately place R.D. at Franklin Academy ("Franklin") and did so on November 1, 2019. (*Id.*). Additional IEP meetings were held on November 20, 2019 and May 7, 2020. (*Id.* at 12-13). Plaintiffs attended each of these meetings with counsel and it appears that concerns with bullying as well as with R.D.'s disability classification were raised at each meeting but that no consensus was reached on either issue. (*Id.* at 13-14). The CSE considered other, academic issues and reviewed progress reports for R.D. from Franklin. (*Id.*). Plaintiffs requested an updated private neuropsychological evaluation at the May 7, 2020 IEP meeting but declined to consent to a District evaluation first being taken for various reasons. (*Id.*).

### II.   Administrative Proceedings

Plaintiffs filed a due process complaint before an IHO appointed by the local board of education pursuant to 20 U.S.C. § 1415(f) and New York Education Law § 4404(1)(a) on December 9, 2020. Plaintiffs subsequently appealed the IHO's decision to an SRO in accordance with New York Education Law § 4404(2). The Court has analyzed both of these decisions in their entirety and refers to them where relevant throughout this decision. For the sake of brevity, the Court summarizes each decision only as required to provide context.

a. The IHO's Decision

Plaintiffs' complaint to the IHO alleged that the District failed to provide R.D. a FAPE for the 2018-19, 2019-20, and 2020-21 school years in violation of IDEA and sought reimbursement for R.D.'s private placement. (Doc. 1-4). The IHO held ten days of hearings between March 1, 2021 and July 8, 2021. (SRO at 8). The IHO's decision was issued on October 1, 2021. The IHO held that the District partially denied R.D. a FAPE because it failed to properly address bullying concerns until the September 6, 2019 safety plan. (IHO at 23). The IHO, as a result, granted Plaintiffs a 25% reimbursement for tuition and costs of private placement for the 2019-20 year. (*Id.* at 48). The IHO also did not award Plaintiffs any remedy for the 2018-19 year. (*Id.*).

b. Appeals to the SRO

The District appealed the IHO's decision on November 8, 2021. (OSR 0172). Plaintiffs cross-appealed and submitted their brief to the SRO on December 1, 2021. (OSR 0182). Plaintiffs pressed four arguments in opposition to the District's appeal: (i) R.D. was denied a FAPE prior to September 6, 2019; (ii) the IHO should have granted 100% reimbursement for 2019-20; (iii) Franklin Academy was an appropriate private placement for 2019-20; and (iv) the IHO properly weighed the equities in Plaintiffs' favor. (OSR 0174-77). Plaintiffs also stated eleven bases for their cross-appeal: (i) R.D. was not offered a FAPE for 2019-20; (ii) Plaintiffs are entitled to reimbursement for 2020-21; (iii) Franklin Academy was an appropriate private placement for 2020-21; (iv) Plaintiffs were entitled to reimbursement for the updated neuropsychological evaluation; (v) the IHO erred in not admitting Exhibit X; (vi) the equities favor Plaintiffs because of the District's attorney's behavior; (vii) the equities favor Plaintiffs because of the IHO's improper admission of evidence beyond the scope of subpoenas; (viii) the equities favor Plaintiffs because the IHO did not compel a witness to testify after being subpoenaed; (ix) the equities favor Plaintiffs because the District did not produce its superintendent; (x) the equities favor Plaintiffs

because of the District's obstruction; and (xi) the IHO did not address proper classification. (OSR 0177-82).

        c.   The SRO's Decision

The SRO, on January 5, 2022, issued a thorough 27-page decision affirming in part and reversing in part the IHO's ultimate decision and determined that Plaintiffs were not entitled to tuition reimbursement. Specifically, the SRO concluded that: (i) the IHO's determination to not award a remedy for the 2018-19 year (and other issues not appealed by either party) was final and binding on the parties; (ii) the District's classification of R.S. as "Other Health Impaired" rather than "Autism" did not deny him a FAPE; (iii) the District's handling of bullying against R.D., as of September 6, 2019, did not deny him a FAPE and no reimbursement was therefore warranted for private tuition after that date; and (iv) Plaintiffs were not entitled to reimbursement for the updated neuropsychological evaluation. (*See generally*, SRO).

This litigation followed.

## **STANDARD OF REVIEW**[9]

"Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126 (2d Cir. 2019) (internal quotation omitted) "Federal courts reviewing administrative decisions [under IDEA] must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998)).

---

[9] While Plaintiff alone made a motion for summary judgment, it is clear the parties agreed that this action would be resolved either way, using that procedural process. (Opp. Br. at 1). Accordingly, the Court construes that agreement to mean that the parties are on notice that the Court may search the record, pursuant to Fed. R. Civ. P. 56(f), and determine this action with finality now.

Courts reviewing a state agency's decision must base their decision on a preponderance of the evidence and may not substitute their own views on educational policy for those of the school authorities. *W.A.*, 927 F.3d at 144. Review of the state's educational decisions is therefore limited, demanding a level of scrutiny that is more critical than clear error but not nearly as complete as *de novo*. *See C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). The Court's review therefore "only seeks to independently verify that the administrative record supports the district court's determination" regarding the sufficiency of the state's educational decisions. *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir. 2018).

Deference to the administrative decision is particularly appropriate when the administrative officer's review has been thorough and careful, and where the court's decision is based solely on the administrative record. *See M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012). While this Court "do[es] not simply rubber stamp administrative decisions," *Walczak*, 142 F.3d at 129, review of the administrative decision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). The Court must determine first whether the SRO reached "reasoned conclusions" before affording deference. *See M.H.,* 685 F.3d at 246 ("Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive [and must ultimately] defer to the SRO's decision on matters requiring educational expertise unless [the court] concludes that the decision was inadequately reasoned."). "But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role . . . . [T]he purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents." *Id.* at 244.

At the administrative level, the burden of proof and persuasion falls on the school district to demonstrate that the student was not denied a FAPE. N.Y. Educ. Law § 4404(1)(c). On appeal to a federal court, however, the burden of demonstrating that an SRO ruled incorrectly falls on the party challenging that decision. *M.H.*, 685 F.3d at 225 n.3.

## ANALYSIS

Prior to assessing the arguments made on summary judgment, the Court first addresses IDEA's statutory framework as context for this motion.

### I.   Statutory Framework

IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). States receiving public funds are required to provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). Public school districts must provide "special education and related services tailored to meet the unique needs of a particular child, [which are] reasonably calculated to enable the child to receive educational benefits." *Walczak*, 142 F.3d at 122 (internal quotation removed). The relevant state or local educational agency must conduct an individualized evaluation to determine whether a child has a disability and must develop an annual written individualized education program ("IEP") for each child with a disability. 20 U.S.C. § 1414(d). The evaluation process can be initiated by the agency or the child's parent, cannot be commenced without parental consent, and is subject to statutory temporal and procedural requirements. 20 U.S.C. § 1414(a)(1). In New York, IEPs are developed by local CSEs in conjunction with the disabled student's parents. N.Y. Educ. Law § 4402(1)(b)(1).

IDEA requires that parents be provided with an opportunity to present a complaint regarding the identification, evaluation, or placement of their child through the IEP process. 20

U.S.C. § 1415(b)(6)(A). Parents who are dissatisfied with a school district's disability status determination, or IEP, may unilaterally place their child in a private school, at their own risk, and then seek a retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C). Procedurally, the parent must provide notice ten business days before removing their child from public school. 20 U.S.C. § 1412(a)(10)(C)(iii); *Bd. of Educ. of Yorktown v. C.S.*, 357 F. Supp. 3d 311, 316 (S.D.N.Y. 2016). The purpose of that notice is to provide the school district with "an opportunity to develop a FAPE within the District's own schools - thus saving the cost of reimbursement." *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 506 (S.D.N.Y. 2011).

If parents in New York disagree with any part of the IEP process, they may request an impartial due process hearing administered by an IHO appointed by the local education board. *See* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO. *See* N.Y. Educ. Law § 4404(2); *see also* 20 U.S.C. § 1415(g). The SRO's decision may thereafter be challenged in state or federal court. *See* 20 U.S.C. § 1415(i)(2)(A). Reviewing courts "defer to the final decision of the state authorities, that is, the SRO's decision." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (internal quotation marks omitted). When the SRO and IHO decisions conflict, the IHO's decision may be afforded diminished weight. *W.A.*, 927 F.3d at 126.

II.   <u>Substantive Issues</u>

The SRO made three substantive determinations with respect to R.D.'s education that the Court will consider herein: (i) the District adequately addressed concerns of bullying against R.D.

in school;[10] (ii) the District's classification of R.D. as "Other Health Impaired" instead of "Autism" did not deny him a FAPE; and (iii) the District was not required to pay for an updated private neuropsychological evaluation that Plaintiffs obtained for R.D. (*See generally*, SRO). Plaintiffs, in connection with these decisions, have raised a number of substantive, procedural, and legal issues: (i) the District denied R.D. a FAPE by failing to address bullying concerns at school; (ii) the District improperly classified R.D. as "Other Health Impaired";[11] (iii) the District was required to pay for an updated private neuropsychological evaluation that Plaintiffs obtained for R.D.; (iv) Plaintiffs were prejudiced by the District's conduct at the IHO hearing and the IHO's alleged bias; (v) Plaintiffs were denied the right to voice concerns about the September 6, 2019 safety plan; (vi) the IHO erred in its rulings on certain evidence; and (vii) the SRO erred by not providing Plaintiffs a remedy for the denial of FAPE to R.D. in the 2018-19 school year. (*See generally*, Pl. Br.). The Court will address the substantive issues raised by Plaintiffs first and then the procedural and legal issues.

a. Deference Given on Substantive Issues

When an SRO's opinion is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," it is entitled to substantial deference. *K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16-CV-03138, 2019 WL 6907533, at *7 (S.D.N.Y. Dec. 19, 2019) (internal citation removed). "[T]he Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when [as here] the substantive adequacy of an IEP, as

---

[10] Relatedly, the SRO determined that although R.D. was denied a FAPE for the 2019-20 school year until the District implemented the September 6, 2019 safety plan, this period of denial covered only four days and the IHO erred in awarding Plaintiffs a 25% tuition reimbursement for that period of time.

[11] Plaintiffs, as discussed *infra*, raised this issue to the SRO but do make any argument about it in briefing in this action. That issue is therefore waived. *See C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-09950, 2018 WL 1627262, at *28 (S.D.N.Y. Mar. 30, 2018) ("To the extent Plaintiff had other bullying claims, she waived them by failing to raise them distinctly in either of her briefs." (citing *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004))).

opposed to the procedural adequacy, is at issue; when [as here] the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when [as here] the district court's decision is based solely on the administrative record that was before the SRO." *Id.*[12]

Plaintiffs argue that the SRO's decision is not entitled to deference because the SRO (and IHO) erred in making a factual finding that a meeting occurred on September 6, 2019, at which the District set forth a new safety plan for R.D. and gave Plaintiffs an opportunity to voice their concerns with respect thereto. The Court considers the substantive issue of Plaintiffs' ability to participate at the September 6, 2019 meeting *infra*. With respect to deference, the SRO did not make an erroneous factual finding on this issue, its opinion is otherwise "well-reasoned," and the Court, accordingly, finds that it is entitled to significant deference on the substantive educational issues of the propriety of the District's treatment of bullying of R.D., R.D.'s disability classification, and reimbursement for the updated private neuropsychological evaluation.

b. Bullying

The SRO affirmed the IHO's determination that the District's conduct with respect to bullying, after September 6, 2019, did not deny R.D. a FAPE. Specifically, the SRO determined that the District's safety plan adequately fulfilled the District's substantive obligations with respect

---

[12] Plaintiffs, as further discussed in detail *infra*, have argued that the IHO should have considered certain evidence that it declined to admit, and the SRO upheld that determination. Plaintiffs have unilaterally supplemented the record in this case by offering that evidence on this motion. Because the Court finds that the subject evidence was immaterial to the IHO's and SRO's decisions, the fact that the record before this Court differs from the administrative record due to the inclusion of this evidence does not alter the Court's determination that the SRO's determination is entitled to deference.

to bullying.[13]

The Second Circuit has recognized that "a child with a disability who is severely bullied by her peers may not be able to pay attention to her academic tasks or develop the social and behavioral skills that are an essential part of any education." *T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 876 (2d Cir. 2016). The Circuit, however, "has not decided when the failure to address bullying in a student's IEP results in a substantive denial of a FAPE." *C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-09950, 2018 WL 1627262, at *28 (S.D.N.Y. Mar. 30, 2018) (citing *T.K.* 810 F.3d at 876 n.3). The SRO applied the test set forth by the District Court in *T.K.*[14] (SRO at 21 (citing *T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 2d 289, 316 (E.D.N.Y. 2011)). The four-part test for substantive bullying violations set forth by Judge Weinstein and applied by the SRO is as follows: "(1) was the student a victim of bullying; (2) did the school have notice of substantial bullying of the student; (3) was the school deliberately indifferent to the bullying, or did it fail to take reasonable steps to prevent the bullying; and (4) did the bullying substantially restrict the student's education opportunities?" (*Id.*) (cleaned up). The parties do not dispute the SRO's application of this test. Because Judge Weinstein's reasoning is persuasive and the test has been cited favorably in this District, *see, e.g. T.J. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, No.

---

[13] The SRO also considered additional steps offered by the District at different points in time with respect to bullying including, *inter alia*: (i) engaging the Center for Discovery for a "social skills training" group; (ii) placing R.D. in another school district with special programming; (iii) providing shared aide services; (iv) varying supports to address social/emotional functioning and behavioral concerns; and (v) small group and individual counseling. (SRO at 22-23). However, because the SRO found specifically that R.D. was provided a FAPE from September 6, 2019 forward, and because the parties address their arguments on bullying to the September 6, 2019 safety plan, the Court will focus its analysis there as well. (*See* 56.1 at 9 ("The SRO based their finding that the district offered FAPE for the 2019-2020 and 2020-2021 school years on th[e] safety plan.").

[14] Because the Second Circuit determined that the defendant in *T.K.* violated the plaintiffs' procedural rights under IDEA, it declined to address the propriety of the District Court's test for substantive denials of FAPE due to bullying. *T.K.* 810 F. 3d at 876 n.3.

17-CV-09592, 2019 WL 13170168, at *15 (S.D.N.Y. Sept. 30, 2019), the Court adopts it for purposes of this motion.

The SRO's decision focuses on the third *T.K.* factor, *i.e.* whether, after the implementation of the September 6, 2019 safety plan, the District "did take steps to address the bullying incidents that they were aware of, and were not deliberately indifferent to the parents' claims of bullying." (SRO at 24 (quoting IHO at 36) (cleaned up)). The safety plan states that "[t]he purpose of this plan is to provide a safe and secure learning environment that is free from harassment, intimidation, or bullying of [R.D.]." (OSR 4045). The plan placed eleven obligations on District staff, three obligations on R.D., and two obligations on Plaintiffs to help mitigate bullying issues. *Id.* Each Plaintiff testified with respect to the safety plan, as did District staff. (*See, e.g.* OSR 517-519; 2120-33; 2526-30). Plaintiffs, when the safety plan was presented to them, rejected it and "voiced concerns" about it to the District at the meeting held on the matter. (*See, e.g.* OSR 2126). On cross examination in front the IHO, Plaintiffs expressed that they felt the safety plan placed too much responsibility on R.D. to identify problematic situations but acknowledged that they did not propose specific modifications to the plan contemporaneously with its development. (*See* OSR 2133).

Both the IHO and the SRO found, after weighing the merits of the safety plan and assessing the credibility of witnesses' testimony thereto, that it satisfied the District's obligation to take steps to address bullying against R.D. and that, after its implementation, the District could not be considered deliberately indifferent to the issue. The Court defers to those decisions, made with the benefit of hearing live testimony and the ability to assess witness credibility and persuasiveness. *See W.M. on behalf of V.M. v. Bd. of Educ. of Harrison Cent. Sch. Dist.*, No. 16-CV-08732, 2017 WL 5157768, at *15 (S.D.N.Y. Nov. 6, 2017) ("As this issue raises questions that are fundamentally credibility judgments, the court defers to the IHO and SRO's well-reasoned

16

decisions."). Plaintiffs' arguments with respect to bullying focus almost entirely on procedural defaults with respect to the safety plan, discussed *infra*, and substantive issues occurring prior to the safety plan's enactment.

The relevant question, however, is whether the District took steps to address bullying for the 2019-20 school year.[15] That question turns on the merits of the safety plan. On that score, Plaintiffs argue that "[o]ne fault in this plan was that it placed the burden on the student not the school staff to ensure his safety . . . [and] singled him out by having him leave class early which would make him a further target for bullying." (Pl. Br. at 8). With respect to the first issue, although the safety plan allowed for R.D. to report bullying, that was not the only mechanism put in place. District staff were tasked with preventative measures to keep R.D. away from problematic situations, separating offenders from R.D. when situations arose, monitoring school common areas, and even educating other students on bullying. With respect to the second issue, Plaintiffs do not explain how removing R.D. from potentially problematic situations in hallways between classes would lead to, rather than prevent, bullying. In any event, the IHO and SRO thoroughly considered these issues and determined that the safety plan was adequate. The Court affords substantial deference to those determinations, which implicate matters of state educational policy. Plaintiffs do not provide compelling legal or factual reasons to overturn the SRO and do not suggest any specific modifications to the safety plan that would make it more effective.[16]

---

[15] There is no dispute with respect to bullying prior to the 2019-20 school year. (*See, e.g.* IHO at 35 ("it is clear, that prior to September 2019, the bullying substantially restricted [the] [s]tudent's educational opportunities.")).

[16] The Court need not and does not consider the remaining *T.K.* factors—indeed those factors are not in dispute on appeal—given its determination with respect to the third factor that the District took meaningful steps to address bullying and was not deliberately indifferent.

Accordingly, the Court affirms the SRO's decision that the September 6, 2019 safety plan satisfied the District's substantive obligations with respect to bullying and that R.D. was not denied a FAPE for the 2019-20 school year in that regard.[17]

### c. Disability Classification

The SRO also determined that the District's disability classification of R.D. as "Other health-impaired" as opposed to "Autism" did not deny him a FAPE. (SRO at 16-20). Although the SRO spent a significant portion of its analysis on this issue, Plaintiffs do not address it and, therefore, any argument concerning that issue is waived. *See C.S.*, 2018 WL 1627262, at *28 n.38.

In any event, issues of disability classification are often significant when material to a student's eligibility under IDEA. *See, e.g. S.B. v. Goshen Cent. Sch. Dist.*, No. 20-CV-09167, 2022 WL 4134457 (S.D.N.Y. Sept. 12, 2022). However, R.D. qualified as a student with a disability under either an "Other Health Impaired" or an "Autism" classification. (SRO at 18). As such, he was entitled to IDEA eligibility and the District was required to formulate an IEP for him. The IEP necessarily, and as its name suggests, took into account the individualized needs of R.D. The IEP would not change based on the specific disability classification and R.D., therefore, would receive the same education regardless.[18] Thus, the classification becomes a distinction without a difference. *See Carrillo v. Carranza*, No. 20-CV-04639, 2021 WL 4137663, at *15 (S.D.N.Y.

---

[17] The SRO determined that because the safety plan was implemented four days into the 2019-20 school year, the IHO erred by awarding Plaintiffs a 25% reimbursement for the cost of private tuition for that year. (SRO at 21-22). Plaintiffs do not appear to dispute that specific determination. In any event, when SRO and IHO decisions conflict, the Court will defer to the SRO. *M.W.*, 725 F.3d at 139. The Court agrees that Plaintiffs were not entitled to a 25% reimbursement for the four-day deprivation at the beginning of the school year. R.D. was not even placed in private school until November 2019. Nor do Plaintiffs seek specific, alternative relief for the four-day period of FAPE deprivation. Accordingly, that portion of the SRO's determination is also affirmed.

[18] Indeed, "[i]n evaluating each child with a disability . . . the evaluation [must be] sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. 300.304(c)(6).

Sept. 10, 2021) ("for our purposes, the precise disability category in which [a student] is classified is irrelevant.").

The SRO's decision with respect to disability classification is, therefore, affirmed.

### d.   The Private Neuropsychological Evaluation

Plaintiffs seek reimbursement in the amount of $6,800 for the costs of an updated private neuropsychological evaluation conducted for R.D. by the Child Mind Institute on July 13, 2020. The IHO and SRO both considered this issue of private evaluation and determined that Plaintiffs were not entitled to reimbursement. (SRO at 26-21; IHO at 46). Specifically, the SRO determined that, because Plaintiffs are only entitled to a private evaluation at public expense after the District conducts an evaluation with which they disagree, and because no District evaluation was conducted prior to the private evaluation, Plaintiffs were not entitled to reimbursement. (SRO at 26 (citing 34 C.F.R. 300.502(b)(5)).

"A parent is entitled to a publicly funded IEE 'if the parent disagrees with an evaluation obtained by the public agency.'" *D.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 158 (2d Cir. 2020) (quoting 34 C.F.R. § 300.502(b)(1)). Plaintiffs, however, refused to consent to a District neuropsychological evaluation. "The IEE process attempts to level the playing field between parent and government by securing a parent's ability to obtain an independent assessment of their child's disability if the school's falls short." *Id.* at 158. There is simply no entitlement to a private evaluation before a public one has been taken because Plaintiffs cannot know whether the public evaluation "falls short" before it even exists. Plaintiffs' argument that they contracted for the private evaluation because they disliked the psychologist that the District proposed for the public evaluation does not warrant relief. Plaintiffs cite to no authority—and the Court is unaware of

any—for the proposition that such a disagreement would exempt them from first receiving a public evaluation. (*See* Pl. Br. at 14).[19]

The SRO's determination that Plaintiffs were not entitled to reimbursement for the updated private neuropsychological evaluation is, accordingly, affirmed.

III.      Procedural Issues

Plaintiffs raise three procedural issues for the Court to consider: (i) Plaintiffs were prejudiced by the District's conduct at the IHO hearing and the IHO's alleged bias; (ii) Plaintiffs were denied the right to voice concerns about the September 6, 2019 safety plan; and (iii) the IHO erred in its evidentiary rulings with respect to certain additional evidence.

a.      Deference Given on Procedural Issues

IDEA provides that:

> [i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). With respect to such procedural issues, when a court is presented with a thorough, well-reasoned SRO determination, deference is afforded the SRO's decisions. *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014) (explaining that the deference owed depends on "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."); *M.S. v. New York City Dep't of Educ.*, No. 09-CV-04454, 2010 WL 9446052,

---

[19] Any argument advanced by Plaintiffs that the District did not comply with its obligation to conduct triennial evaluation is clearly belied by the record. A neuropsychological evaluation was made for R.D. in November of 2017 and the District sought consent for a reevaluation in July 2020, which it planned to take in November 2020. (SRO at 26).

at *19 (S.D.N.Y. Mar. 12, 2010) ("[D]istrict courts [ought] to defer to the IHO's and SRO's determinations regarding procedural as well as substantive issues"). With respect to the procedural issues raised by Plaintiffs and considered by the SRO, the Court finds that the SRO's decisions thereto are well-reasoned, thorough, and entitled to deference.

b.   Conduct at the IHO Hearing

Plaintiffs contend that the District's attorney engaged in bullying at the IHO hearing after Plaintiffs' counsel disclosed his own Autism diagnosis. (Pl. Br. at 11). Specifically, Plaintiffs allege that the District's attorney's obstructive behavior prevented them from meaningfully presenting their case.[20]

Plaintiffs, in their briefing to the SRO, raised these issues in the context of equitable considerations meriting an award in their favor.[21] (Compl. Ex. 5 at 20-21). The SRO determined that R.D. was not denied a FAPE and then correctly noted that it, therefore, need not consider a balancing of the equities. (SRO at 27). Plaintiffs now, however, attempt to shoehorn this issue as a procedural rather than equitable one. Conduct occurring at an IHO hearing is, as originally argued by Plaintiffs, an equitable consideration. *See, e.g. J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635 (S.D.N.Y. 2011) (considering conduct by both the parents and the district throughout

---

[20] Plaintiffs also reference but do not explicitly raise a concern with the IHO's potential bias in favor of the District. On that score, Plaintiffs admit that their attorney "had concerns about IHO bias but apologized once they were clarified by the IHO." (Pl. Br. at 11). For this reason and because the record does not support any inference of bias, the Court declines to address this issue in any additional detail.

[21] The Supreme Court set forth a three-part test known as the *Burlington/Carter* test for courts to follow when determining if parents in an IDEA case are entitled to reimbursement for placement at a private school: "(1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement." *W.M.*, 2017 WL 5157768, at *2; *see also Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 14–15 (1993); *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985). Where, as here, the first prong is not met because the student was not denied a FAPE, consideration of the remaining factors is unnecessary. *Carrillo*, 2021 WL 4137663, at *19 ("there [i]s no need to address the other two prongs of the so-called *Burlington-Carter* test" where there is no denial of a FAPE.).

the IDEA administrative process as an equitable consideration under *Burlington/Carter*).
Procedural violations arise in the context of a district's development of a student's IEP. There is a
specific set of procedures under state and federal law that a district must go through in developing
an IEP and,[22] if a district defaults, there may be a remedy for a student who was deprived a FAPE
as a result. Equitable considerations, on the other hand, involve conduct by either the district or
the parents that occurred *during that process* that bears on either's right to a remedy. That the
District's attorney allegedly bullied Plaintiffs' counsel at an IHO hearing has nothing to do with
whether the District followed IDEA's procedures in developing R.D.'s IEP.[23] IDEA and state law
are silent with respect to how the District's attorney must behave at a hearing. This issue is,
therefore, an equitable one. Because the Court does not reach the third prong of the
*Burlington/Carter* test, consideration of such equitable issues is unnecessary.

However, even if considered a procedural violation, "[p]rocedural flaws do not
automatically require a finding of a denial of a FAPE. Only procedural inadequacies that
individually or cumulatively result in the loss o[f] educational opportunity or seriously infringe on
a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE."
*Carrillo*, 2021 WL 4137663, at *11. The extensive hearing transcript—covering ten days of
proceedings—reflects that Plaintiffs had ample opportunity to present their position, examine
witnesses, and more. Any alleged obstruction by the District's attorney did not seriously infringe
on the right to be heard. Moreover, because "Plaintiffs have now sought three levels of review . .
. to the IHO, SRO, and now this Court," any alleged limitation on their right to be heard "has been
compensated for in bounds throughout this lengthy appellate process." *S.B.*, 2022 WL 4134457, at

---

[22] *See, e.g.* 20 U.S.C. § 1414 (d)(1)(B)(ii) (a CSE must consist of "not less than 1 regular education teacher
of [the] child'").

[23] To be clear, although these allegations are concerning, they do not implicate procedural compliance with
IDEA.

*15. Lastly, to the extent Plaintiffs also argue that the District's attorney's conduct at CSE meetings was obstructive, "[o]nly in egregious circumstances where the plaintiffs demonstrate that a district convened a CSE meeting with an entirely closed mind is a claim of predetermination sufficient to overturn an IEP." *M.S.*, 2010 WL 9446052, at *20. There is simply insufficient evidence to support a claim of predetermination here where the District repeatedly revised its planning, held frequent hearings, and offered various forms of programming to address R.D.'s needs.

### c. Participation in the September 6, 2019 Safety Plan

Plaintiffs argue that "there was no official meeting held for the parents to provide feedback" on the September 6, 2019 safety plan. Plaintiffs' inconsistent positions in briefing with respect to the occurrence of this meeting, however, fail to warrant relief. (*Compare* Pl. Br. at 8 ("[t]he parents did not find this plan adequate and there was no meeting on this date") *with* Reply at 1 ("[i]t is clear from this meeting on or about September 6, 2019, this was not a legal IEP meeting since none of the teachers or staff were present for the school district, only the superintendent.")).

As an initial matter, the record is clear that a meeting occurred with respect to the safety plan. (*See* SRO at 5 ("[o]n or about September 6, 2019, district staff met with the parents and discussed a safety plan the district had developed"); IHO at 34 ("[a] meeting was held on September 6, 2019 to discuss the proposed plan with the intent to provide a safe and secure learning environment . . . .")). The safety plan itself states at the top: "Date of Meeting: September 6, 2019." (OSR 4045). The District's attorney asked K.D. during her testimony in front of the IHO, "looking at the first page [of the safety plan], date of meeting September 6th, 2019, was there a meeting at which this safety plan was proposed and at which it was discussed?" (*Id.* at 2120-21). K.D. responded "[y]es, there was," although she noted that she thought the meeting may have occurred

slightly after that date. (*Id.* at 2121). K.D. also testified, when asked if she made any suggestions for the plan, that "[w]e voiced our concerns." (*Id.* at 2133).

Plaintiffs' objection is that any meeting that was held on the safety plan was not an official IEP meeting and that, because "there is no evidence of a written amendment to the IEP," the safety plan could not have been incorporated into it. (Reply at 2). This, however, is not a procedural violation. Neither IDEA nor New York State law require—and Plaintiffs have not identified such a requirement—that schools only address bullying through the formal IEP process. Districts are required to take reasonable measures to address bullying and not act deliberately indifferent. *See T.K.*, 779 F. Supp. 2d at 318. A rule requiring that schools can only take steps to address bullying if those steps are accompanied by formal IEP amendment would inhibit the ability to address bullying. Indeed, the SRO noted that "I am aware of no authority for the proposition that a CSE is required to include a 'safety plan' in an IEP." (SRO at 22 n.16). Courts, moreover, routinely assess steps taken by schools outside of the formal IEP process in determining whether a district has complied with its obligations to mitigate bullying. *See, e.g. E.L. v. Bedford Cent. Sch. Dist.*, No. 18-CV-03062, 2022 WL 3667189 (S.D.N.Y. Aug. 25, 2022); *C.S.*, 2018 WL 1627262, at *9; *T.K.* 779 F. Supp. 2d at 318. For the reasons stated *supra*, the safety plan satisfied the District's obligations, regardless of whether it was incorporated into the IEP.

Further, Plaintiffs identify no plausible prejudice in the failure to hold a formal IEP meeting on the safety plan. There is no allegation that the plan was any less effective because it was not included in an IEP. Moreover, Plaintiffs were not denied an opportunity to be involved because, as they admit, they "voiced [their] concerns." (OSR 2133). Because "Plaintiffs have not demonstrated that they were prejudiced by [this alleged] procedural violation . . . the Court upholds the SRO's determination." *S.B.*, 2022 WL 4134457, at *15.

d.  <u>Evidentiary Rulings</u>

Plaintiffs' final procedural argument is that the IHO and SRO erred in evidentiary rulings relating to: (i) a document submitted under seal, "Exhibit X," which is a set of screenshots of Facebook postings by parents of other students on or around May 9, 2019 when R.D. was removed from school for a bullying incident; (ii) testimony from the District's superintendent and his records, which were allegedly subpoenaed for the IHO hearing but not admitted because the superintendent was on medical leave; and (iii) records allegedly beyond the scope of the subpoenae they were produced under. (Pl. Br. at 11-13). The SRO determined that this evidence was unnecessary for it to render its decision. The Court declines to disturb the SRO's finding concerning this evidence. Plaintiffs argue that "the failure to produce the superintendent who had key information meant everything the parents testified to regarding their conversation with him must be assumed to be true." (*Id.* at 13). This, however, would appear to benefit, rather than prejudice, Plaintiffs. The Court, moreover, has reviewed "Exhibit X" and finds that its admission would not have altered the SRO's operative determination with respect to bullying, *i.e.* that the September 6, 2019 safety plan satisfied the District's obligations. Facebook communications between other parents months before the safety plan's issuance is hardly relevant to the validity of the merits of that plan. Plaintiffs make no argument with respect to prejudice from the admission of documents "beyond the scope of the subpoena." Simply put, the IHO did not err in its evidentiary rulings on the evidence referenced by Plaintiff, as none of that evidence would have been material to its decision and Plaintiffs were not otherwise prejudiced.

Ultimately, none of the procedural issues raised by Plaintiffs, individually or cumulatively, resulted in a denial of FAPE to R.D. *See E.L.*, 2022 WL 3667189, at *17. The Court, accordingly, upholds the SRO's determinations with respect to the alleged procedural issues.

IV.    Legal Issue

Plaintiffs' final argument is that they are entitled to a remedy for the 2018-19 school year. The IHO determined that the District "took no specific steps to address [bullying] concerns for the 2018-2019 year . . . [and] prior to September 2019, the bullying substantially restricted [R.D.]'s educational opportunities." (IHO at 35). The IHO, however, declined to award a remedy for any deprivation occurring in the 2018-19 year. Because R.D. was placed in private school in November 2019, Plaintiffs had only requested in their post-hearing brief to the IHO tuition reimbursement for the 2019-20 and 2020-21 school years. (OSR 5211-12).[24] The SRO did not review the IHO's decision to decline to award a remedy for the 2018-19 year because neither the District nor Plaintiffs appealed that issue. The SRO held that "the IHO's determinations on [issues not appealed] have become final and binding on the parties and will not be reviewed on appeal." (SRO at 16). Plaintiffs argue, however, that "[t]he district contends the parents did not appeal the IHO's denial of a remedy which is not the case" without citation to authority. (Pl. Br. at 9).

"A district court is not required to give state administrative proceedings special weight when the administrative decision concerns an issue of law." *S.B.*, 2022 WL 4134457, at *8 (citing

---

[24] Plaintiffs also requested "[a]ny further relief, *including compensatory education*, which the Hearing Officer deems just and proper." (OSR 5212 (emphasis added)). It is unclear, however, whether this requested compensatory education was for the 2018-19 school year or for another period of time. "Compensatory education 'must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'" *M.T. v. Arlington Cent. Sch. Dist.*, No. 22-CV-00437, 2022 WL 16857176, at *7 (S.D.N.Y. Nov. 10, 2022) (quoting *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 457 (2d Cir. 2015)). Compensatory education is designed to compensate a student for lost educational opportunities and typically takes the form of educational services and programming, rather than monetary relief. *See, e.g. id.* at *9 (listing different types of compensatory education). However, "where the record reflects that 'the alleged deficiencies suffered by the student have already been mitigated (or even totally alleviated),' an award of compensatory education may not be required." *Id.* at *8 (quoting *Doe by & through Doe v. E. Lyme Bd. of Educ.*, No. 11-CV-00291, 2020 WL 7078727, at *12 (D. Conn. Dec. 3, 2020)). Moreover, "the plaintiff has the burden of proposing a well-articulated plan that reflects the student's current education abilities and needs and is supported by the record." *Id.* (citation omitted). Thus, even to the extent Plaintiffs requested compensatory education for the 2018-19 year from the IHO, the IHO did not err in denying it and the Court defers to that decision. *See id.* at *8 ("determinations with respect to proscribing compensatory education plans are entitled to significant deference because such determinations involve matters of educational policy.").

*Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)). Nevertheless, the SRO's holding that the IHO's denial of a remedy for the 2018-19 school year became final upon the parties was a correct application of the law.

Federal law requires that "any party aggrieved by the findings and decision" of an initial administrative hearing to be able to "appeal such findings and decision to the State educational agency." 20 U.S.C. § 1415(g)(1). Federal regulations require that any decision not appealed to the SRO is final upon the parties. 34 C.F.R. § 300.514. Thus, "an IHO's decision is binding upon the parties absent an appeal to the SRO." *D.N. v. New York City Dep't of Educ.*, 905 F. Supp. 2d 582, 587 (S.D.N.Y. 2012); *see also B.P. v. New York City Dep't of Educ.*, No. 14-CV-01822, 2014 WL 6808130, at *7 (S.D.N.Y. Dec. 3, 2014), *aff'd*, 634 F. App'x 845 (2d Cir. 2015) ("a party's failure to raise an argument during administrative proceedings generally results in a waiver of that argument.").[25] A review of the record shows definitively that Plaintiffs did not raise the issue of remedy for the 2018-19 year in their cross-appeal and answer to the SRO. (OSR 0175-83).[26] That issue is therefore waived.[27]

The SRO's decision that Plaintiffs are not entitled to tuition reimbursement is, therefore, affirmed. Given this disposition, the Court need not and does not consider the remaining prongs

---

[25] One exception to this rule is that "it does not necessarily follow that a party who does not cross-appeal a *favorable* IHO decision is precluded from asserting alternative grounds upon which a reviewing court might sustain or reinstate the IHO's judgment." *D.N.* 905 F. Supp. 2d at 587 (emphasis added). That, however, is clearly not the case here because the IHO's decision to decline a remedy for 2018-19 was adverse to Plaintiffs' interests.

[26] The Court notes that Plaintiffs also neglected to mention the 2018-19 school year in the "relief requested" section of their Complaint in this matter. (Compl. at 18).

[27] Defendant frames its argument on this issue as one relating to failure to exhaust administrative remedies and subject-matter jurisdiction. (Opp. Br. at 7-11). The cases cited by Defendant on this score, however, involve plaintiffs who did not seek state-level review of their IDEA claims at all. *See Baldessarre ex rel. Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 496 F. App'x 131 (2d Cir. 2012). Because the Court finds that the argument has been waived, it declines to wade into this issue.

of the *Burlington/Carter* test, *i.e.* the suitability of private placement and the equities. *See M.T.*, 2022 WL 16857176, at \*11 n.14 (citing *W.G. v. New York City Dep't of Educ.*, 801 F. Supp. 142, 175 (S.D.N.Y. 2011)).

V.    Non-IDEA Claims

The preliminary statement of Plaintiffs' Complaint purports to raise claims under New York Education Law, the ADA, and Section 504. Plaintiffs, however, do not make substantive arguments with respect to any of these laws and do not state specific claims for attendant relief. Moreover, when based on the same core set of underlying facts, claims made under these laws are generally derivative of IDEA. *See Maus v. Wappingers Cent. School District*, 688 F. Supp. 2d 282, 294 ("Defendants are also entitled to summary judgment on Plaintiffs' Rehabilitation Act and ADA claims, which arise from the same core facts underlying Plaintiffs' IDEA claim."); *S.B.*, 2022 WL 4134457, at \*7, n.10 ("New York Education Law § 4402 is part of New York State's implementing statute for IDEA . . . the Court's analysis as to the IDEA claim applies equally to the § 4402 claim."). Therefore, to the extent Plaintiffs raise non-IDEA claims, those claims are likewise dismissed for the same reasons applicable to their IDEA claims.

## CONCLUSION

In light of the foregoing, and the Court having searched the record, Plaintiffs' motion for summary judgment in their favor is DENIED, the SRO's decision is AFFIRMED, and this action is dismissed.[28]

The Clerk of the Court is respectfully directed to: (i) terminate the motion sequence pending at Doc. 22; and (ii) close this case.

---

[28] Plaintiffs' request for attorneys' fees is, accordingly, denied. *See M.T.*, 2022 WL 16857176, at \*11 n.15 ("IDEA provides that attorneys' fees may be awarded to parents of a child with a disability if they are the 'prevailing party' in the litigation." (quoting 20 U.S.C. § 1415(i)(3)(B)(i))).

**SO ORDERED**:

Dated: White Plains, New York
      April 20, 2023

Philip M. Halpern
United States District Judge